UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

World Business Lenders, LLC,

                                  Case No. 16-cv-329 (PAM/KMM)

              Plaintiff,

v.                                  **MEMORANDUM AND ORDER**

Joseph F. Palen,
and Robert Carlson,

              Defendants.
_____

This matter is before the Court on Defendants' Motions for Summary Judgment. For the following reasons, the Motions are granted in part and denied in part.

## BACKGROUND

### A.    The Parties

Plaintiff World Business Lenders ("WBL") is a private capital lender headquartered in New York City. (Compl. (Docket No. 1) ¶ 1.) WBL makes short-term loans to businesses that need money but do not qualify for conventional business loans. (Pardes Decl. (Docket No. 82) ¶ 2.) Because of the risk involved in making these types of loans, WBL charges significant interest rates, relies on security interests in available property, obtains personal guaranties, and collects automatic daily payments directly from the borrower's bank account. (Id. ¶ 4.)

Defendant Joseph Palen owns a small business in Minneapolis, Minnesota buying and selling new and used restaurant equipment under the business names Jos. F. Palen Co. and Jos. F. Palen Restaurant Equipment. (Palen Decl. (Docket No. 64) ¶¶ 5, 6.)

Palen is 72 years old and has worked in the kitchen equipment business for over 52 years. (Id. ¶¶ 3, 6.) He does not own a computer or cell phone and does not use email. (Id. ¶ 8.) He completes all business accounting records by hand and believes handwritten thank-you notes are critical to building and maintaining relationships. (Id.)

Defendant Robert Carlson works in the commercial finance industry, "primarily help[ing] companies grow through various forms of financing." (Carlson Dep. (Docket No. 65-1) at 14, 15.) Carlson previously worked in the restaurant industry for over 12 years, owning several restaurants in the Twin Cities area. (Id. at 13.) Carlson and Palen previously knew each other due to their shared experience in the restaurant industry. (Palen Decl. ¶ 10.)

Third party Jason Hines was a Twin Cities area restaurateur who owned several entities called KB&J Enterprises, Inc., Pot Luck Catering, Inc., JHH Rogers, LLC, JCC Plymouth, LLC, and Preserve of Plymouth, LLC. (Hines Dep. (Docket No. 66) at 14-16.) Through these entities, Hines operated multiple restaurants including four Broadway Pizzas, two restaurants called Harvest Grill located in Rogers and Coon Rapids, and a catering company located in Plymouth. (Id. at 10-11.) Hines first met Carlson in 1996 and considered him a resource when he was seeking financing to open restaurants. (Id. at 17-18.)

**B.    Hines and Carlson Seek Financing for a Third Harvest Grill**

In 2012, Hines decided to convert his catering company into a third Harvest Grill restaurant. (Id. at 94-95.) Carlson knew that Hines would need money to convert his catering facility into a restaurant and began to seek financing for Hines with a company

called Oakmont Finance. (Carlson Dep. (Docket No. 84-4)[1] at 29-30; ElShareif Decl. (Docket No. 65-1) Ex. 6, 7.) Oakmont Finance, however, refused to extend Hines any financing because of his poor credit history. (ElShareif Decl. Ex. 8.)

**C.     Hines, Carlson, and Palen Meet**

In early 2013, Carlson approached Palen about doing business with Hines. (Palen Decl. ¶ 11.) According to Palen, Carlson informed him that Hines wanted to purchase a large amount of kitchen equipment for the new Harvest Grill that was identical to the kitchen equipment in the other Harvest Grills. (Id.; Hines Dep. at 50.) Based on this request, Palen started to work on the potential sale by visiting the new Harvest Grill site, taking measurements, meeting with the general contractor, and collecting other data. (Palen Decl. ¶¶ 12-18.) According to Carlson, Hines informed Palen that he was negotiating a sale/leaseback arrangement with WBL and wanted Palen to buy kitchen equipment from Hines, sell that equipment to WBL, and have WBL lease the equipment to Hines. (Carlson Dep. (Docket Nos. 57, 84-4) at 57-58, 70, 76.) At some point, the three men met in person (Hines Dep. at 37), but the record is unclear when and where these conversations took place.

---

[1] The parties force the Court to cite to multiple exhibits although referencing a previously cited deposition. Instead of attaching a witness's entire deposition, each party has cherry-picked portions of the deposition that they find relevant and attached only those portions as exhibits. This practice is incredibly unhelpful. Not only does it require the Court to cite to multiple exhibits, it also fails to give the Court the full context of the evidence. The parties and their counsel should refrain from this unhelpful and inefficient practice in the future and attach a witness's entire deposition as an exhibit.

**D.    The Fake Invoices**

On March 15, 2013, Carlson asked Palen to fill out several handwritten invoices that indicated Palen had already sold certain kitchen equipment to Hines. (Palen Decl. ¶ 20, Exs. 11-15.) Carlson provided Palen with the information to write on the invoices, including dollar amounts and separate equipment lists. (Id.) Palen did not know why Carlson asked him to do this, but thought it was possible that Hines wanted Palen to find and sell him the equipment on the attached lists. (Id.) Palen did not expect that Hines would pay him the amounts on the invoices and did not own the equipment on the attached lists. (Palen Dep. (Docket No. 84-3) at 48, 60.) Palen filled out the invoices in his handwriting and eventually gave them to Carlson. (Id. at 56.) Carlson took Palen's handwritten invoices and scanned and emailed them to Hines. (ElShareif Decl. Exs. 9-12.) Carlson or Hines then provided Palen with typed-up invoices that resembled Palen's handwritten invoices. (Palen Decl. ¶ 22, Exs. 16-20.)

**E.    The March 25 Agreement**

On March 22, Hines's attorney, Greg Miller, sent Carlson and Hines a draft of a document that Miller referred to as the "Pot Luck/Palen Agreement." (ElShareif Decl. Ex. 14.) The document details a sale/leaseback arrangement in which Palen agreed to purchase kitchen equipment from Hines, Hines would use his best efforts to obtain a lease arrangement for the kitchen equipment, and after receiving the lease proceeds, Palen would convey the leased equipment to Hines while keeping a small profit. (Id.) On March 25, Palen signed the agreement. (Palen Decl. Ex. 28.) Palen, however, does

not remember seeing or signing the agreement, and did not buy any kitchen equipment from Hines. (Palen Decl. ¶ 38.)

**F.     Hines Seeks Financing from WBL**

At some point in early 2013, a company called Kingswood Leasing contacted Hines and offered to find him financing for the third Harvest Grill. (Carlson Dep. (Docket No. 57) at 43.) Hines expressed interest and Kingswood, acting as a broker, referred Hines to WBL. (Herman Dep. (Docket No. 57) at 25.) Hines told WBL that the purpose of the loan was to pay Palen for the kitchen equipment that he had allegedly already purchased. (Id. at 43.) In May, Hines and WBL began negotiating the terms of the loan agreement. (Moen Decl. Ex. H-2 (Docket No. 59) at WBL 116-1034.)

On May 14, Hines emailed the fake, typed-up invoices to WBL, representing that Palen had sold the kitchen equipment to Hines, and that Hines owed Palen for the equipment. (ElShareif Decl. Ex. 19.) WBL also requested photos of the kitchen equipment, along with the serial numbers. (Id.) On May 22, WBL prepared a "Loan Committee Approval Sheet" that contained extensive information about Hines's loan with WBL. (ElShareif Decl. (Docket No. 70) Ex. 20.) The Approval Sheet indicated that the loan was for $250,000 with a 75% interest APR to be paid over eight months. (Id.) It also indicated that Hines personally guaranteed the loan, WBL would obtain a lien on three of Hines's properties, and WBL would have a purchase money security interest in the kitchen equipment that Hines had allegedly purchased from Palen. (Id.)

5

**G. Hines and Carlson Attempt to Have WBL Wire the Loan Proceeds to Miller**

On May 23, a WBL representative emailed Hines and stated, "Everything is moving along towards a funding next week. If by Monday you can get me the invoice requirement I needed from [Palen] that would be great . . . I'll also need wiring instructions for Jos. F. Palen if that is how they wish to be paid." (ElShareif Decl. Ex. 21.) On May 29, Carlson emailed Hines and stated, "Here is Joseph F Palen Restaurant Equipment attorney's wiring instructions. His name is Greg Miller. Joe would like the money wired to this account because he will likely be out of town." (Id. Ex. 23.) But Miller has never met Palen, let alone represented him. (Palen Dep. at 36.) Rather, Miller was Hines's attorney, and Carlson knew that. (Carlson Dep. (Docket No. 57) at 122.) Ten minutes after receiving Carlson's email, Hines forwarded the email and wiring instructions to WBL. (ElShareif Decl. Ex. 24.)

On June 4, another WBL representative emailed Miller requesting that Miller "issue a letter that contains the language below from your firm to facilitate the funding of the purchase price for the related equipment. The letter is necessary in terms of perfecting World Business Lenders interest as a purchase money secured party. I have attached the invoices for your convenience." (Id. Ex. 29.) The "language below" read in full:

> This firm serves as counsel to Jos. F Palen Restaurant Equipment Inc. ("Client") in connection with the sale of restaurant equipment listed on the attached invoice, the firm has been asked to act as escrow agent for the receipt of purchase proceeds in the amount of $250,000, representing the balance due in connection with the purchase of the listed equipment. I represent that the proceeds of the wire will be remitted to Client (net of any fees due to the firm) and that I have no knowledge or reason to believe after

6

due inquiry, that the proceeds of the wire are for any purpose other than the purchase of said restaurant equipment. I acknowledge that World Business Lenders, LLC is relying on the representations herein as a basis for funding a loan to KBJ's Enterprises Inc.

(Id.) Twelve minutes later, Miller forwarded the email he had just received from WBL to Hines and Carlson and stated, "I cannot issue a letter that says what he wants. I'm not Joe's attorney . . . Joe will have to have the money wired to him and he can disburse." (Id. Ex. 30.) Carlson responded almost immediately and asked, "One idea would be to have them issue the check to Joe himself??? Do you think that would work?" (Id.) Miller responded to WBL eight minutes later and stated that "the best avenue is to just send a cashier's check to Joe directly." (Id. Ex. 29.) Later that afternoon, WBL emailed Carlson and stated, "[W]e need you to copy and paste the paragraph below onto a Joseph Palin [sic] company letterhead, have Mr. Palin [sic] sign it and fax or email it back with the wiring instructions for the Palin [sic] business account." (Id. Ex. 31.)

H.  **Palen Signs the Acknowledgment and WBL Wires Palen the Loan Proceeds**

On June 5, Palen signed a letter that the parties refer to as the "Acknowledgment." The Acknowledgment stated:

> The undersigned, on behalf of Joseph F Palen Restaurant Equipment Inc. acknowledges receipt of $250,000 from World Business Lenders, LLC in payment of the balance of the purchase price due from KBJ Enterprises Inc. in connection with the purchase of the equipment listed on the attached invoices. The undersigned further represents that this purchase is an arm's length transaction and acknowledges that World Business Lenders, LLC is relying on this receipt and the representations herein funding a loan to KB&J Enterprises, Inc. in connection with said purchase transaction.

(Pardes Decl. (Docket No. 82-2) Ex. 44.) The Acknowledgment was then faxed to WBL. (Id.) Although the cover sheet indicates the fax is from Palen, Palen contends that he did

not fax the Acknowledgment to WBL. (Id.; Palen Decl. ¶ 25.) The next day, Carlson told WBL that it should have a fax from Palen with the Acknowledgment, and sent WBL Palen's wiring instructions. (Pardes Decl. Ex. 43.)

On June 6, WBL wired $250,000 to Palen's bank account. (Palen Decl. ¶ 29.) That same day, Carlson and Hines contacted Palen and told him that Hines was not ready to purchase kitchen equipment for the third Harvest Grill and that Hines did not feel comfortable with Palen holding the loan proceeds until Hines was prepared to do so. (Palen Decl. ¶ 30; Hines Dep. at 50-51, 111.) Based on this request, Palen went to his bank and had two cashier's checks made out to Hines in the amount of $250,000. (Palen Decl. ¶ 30.) Carlson met Palen at the bank and took the checks to Hines. (Palen Dep. (Docket No. 57) at 106.) But instead of eventually purchasing kitchen equipment from Palen, Hines began paying off other debts. (Hines Dep. at 100-101.) Palen continued to work on closing a large sale of kitchen equipment to Hines but was unable to do so. (Palen Decl. ¶¶ 31-35.)

I. **Hines Defaults and Files for Bankruptcy**

After Hines received WBL's loan on June 6, he began making daily payments of $1,961.12 until December 2013, totaling $198,913.01. (ElShareif Decl. (Docket No. 72) Ex. 33.) Hines eventually defaulted on the loan and WBL sued Hines in state court. (Pardes Decl. ¶ 17.) The state court granted summary judgment in WBL's favor, awarded WBL a money judgment against Hines and his entities in the amount of $333,744.05 plus interest, and authorized WBL to foreclose on Hines's mortgages. (ElShareif Decl. Ex. 34.) Following a foreclosure sale of Hines's properties, the state

8

court entered a deficiency judgment against Hines in the amount of $234,272.94. (ElShareif Decl. (Docket No. 73) Ex. 35.)

On July 22, 2015, Hines and his entities filed for bankruptcy. (Ringquist Decl. (Docket No. 84-6) Ex. B.) WBL initiated an adversary action in the bankruptcy, seeking court determination that the debt Hines owed to WBL was non-dischargeable. (Pardes Decl. ¶ 19.) During the bankruptcy proceedings, WBL attempted to repossess the kitchen equipment that Hines had pledged as security, only to find out that Hines never owned the equipment. (Ringquist Decl. (Docket No. 84-6) Ex. C.) WBL and Hines eventually entered into a settlement agreement in which Hines agreed to pay WBL $120,000 by December 31, 2017. (ElShareif Decl. Ex. 36 (Docket No. 74) ¶ 1.) Hines also agreed to cooperate in this lawsuit. (Id. ¶ 7.)

**J.    Procedural Posture**

On February 10, 2016, WBL filed its Complaint against Palen, Palen's wife, and Carlson, alleging claims of fraudulent misrepresentation and omission, negligent misrepresentation, conversion, civil theft, tortious interference with a contract, and civil conspiracy. (Docket No. 1.) In February 2017, the Palens and Carlson each filed the instant Motions for Summary Judgment. (Docket Nos. 48, 50.) Shortly thereafter, WBL agreed to dismiss Mrs. Palen from the case. (See Docket Nos. 53, 55.)

**DISCUSSION**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**A.      Fraudulent Misrepresentation**

To establish a fraudulent misrepresentation claim, WBL must prove that (1) Defendants made a false representation of a past or existing material fact susceptible of knowledge; (2) Defendants made the representation with knowledge of its falsity or without knowing its truth or falsity; (3) Defendants intended to induce WBL to act in reliance on the representation; (4) the representation caused WBL to act in reliance; and (5) WBL suffered pecuniary damages as a result of the reliance. See Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 368 (Minn. 2009).

WBL contends that Palen made a fraudulent misrepresentation when he signed the Acknowledgment. Palen counters that the Acknowledgment does not amount to a fraudulent misrepresentation for three reasons. First, Palen argues that the Acknowledgment is not false because he intended to sell equipment to Hines when he signed the Acknowledgment. But the Acknowledgment states that Palen is receiving the loan proceeds "in payment of the balance of the purchase price due from KBJ Enterprises Inc. in connection with the purchase of the equipment listed on the attached invoices."

(Pardes Decl. Ex. 44.) This statement indicates that Hines had already purchased the kitchen equipment from Palen and that the loan proceeds would satisfy the payment for that purchase. A balance would not be due if the purchase had not already occurred. At best, the Acknowledgment is ambiguous and a jury should determine whether the Acknowledgment constitutes a false representation about a past or existing fact, rather than Palen's future intentions.

Second, Palen argues that WBL did not reasonably rely on the Acknowledgment. "Whether a party's reliance is reasonable is ordinarily a fact question for the jury unless the record reflects a complete failure of proof. . . . [A] party can reasonably rely on a representation unless the falsity of the representation is known or obvious to the listener." Hoyt Properties, Inc. v. Prod. Res. Grp., L.L.C., 736 N.W.2d 313, 321 (Minn. 2007). Palen does not contend that WBL knew the Acknowledgment was false and therefore cannot establish that WBL did not reasonably rely on the Acknowledgment as a matter of law.

Third, Palen argues that the Acknowledgment was not the proximate cause of WBL's injury. But proximate cause is generally a question of fact for the jury to determine. Bryan v. Kissoon, 767 N.W.2d 491, 495 (Minn. Ct. App. 2009). If WBL can establish the other elements of fraudulent misrepresentation, a jury could infer that it was reasonably foreseeable to Palen that Hines would default on his loan. Summary judgment is therefore inappropriate on WBL's fraudulent misrepresentation claim against Palen.

Summary judgment is also inappropriate on WBL's fraudulent misrepresentation claim against Carlson.  Although WBL does not have a direct misrepresentation claim against Carlson, genuine issues of material fact concerning Carlson's role in this matter preclude summary judgment.

WBL does not have a direct claim against Carlson because Carlson did not make the representations that WBL contends he made.  WBL argues that Carlson was involved in the drafting of the fake invoices, the March 25 Agreement, and the Acknowledgment.  But even assuming all that is true, Carlson did not send any of those documents to WBL, rather Hines or Palen did.  WBL also points out that Carlson misrepresented that Miller was Palen's attorney.  But Carlson only sent that email to Hines, and it was Hines who forwarded it to WBL.  Moreover, the representation that Miller was Palen's attorney did not induce WBL to provide Hines with the loan, Palen's Acknowledgment allegedly did.

But in the alternative to a direct claim, WBL argues that Carlson is liable for fraudulent misrepresentation under the theory of joint concerted tortious conduct.  Minnesota has "long relied on the 'well recognized' rule 'that all who actively participate in any manner in the commission of a tort, or who procure, command, direct, advise, encourage, aid, or abet its commission, or who ratify it after it is done are jointly and severally liable' for the resulting injury.'"  Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 185-86 (Minn. 1999).  Based on Carlson's role in providing Palen with the Acknowledgment, procuring his signature, and returning it to WBL, a reasonable jury could conclude that Carlson directed, advised, encouraged, or aided Palen to make a fraudulent misrepresentation.  Carlson is therefore not entitled to summary judgment.

**B.     Fraudulent Omission**

To establish a fraudulent omission claim, "the party concealing the fact must have been under a legal or equitable obligation to communicate the fact to the other party." Graphic Commc'ns Local 1B Health & Welfare Fund A v. CVS Caremark Corp., 850 N.W.2d 682, 695 (Minn. 2014). "[O]ne party to a transaction has no duty to disclose material facts to the other," except in three "special circumstances." Klein v. First Edina Nat'l Bank, 196 N.W.2d 619, 622 (Minn. 1972). First, a party who "has a confidential or fiduciary relationship with the other party to the transaction must disclose material facts." CVS Caremark, 860 N.W.2d at 695. Second, a party "who has special knowledge of material facts to which the other party does not have access may have a duty to disclose those facts to the other party." Id. Third, a party "who speaks must say enough to prevent the words communicated from misleading the other party." Id.

Viewing the facts in the light most favorable to WBL, both Palen and Carlson knew that Palen had not sold Hines the kitchen equipment at the time Palen signed the Acknowledgment. A reasonable jury could conclude that they had a duty to disclose that fact to WBL or should have said more to prevent their other communications from misleading WBL. Summary judgment is therefore inappropriate on WBL's fraudulent omission claim.

**C.     Negligent Misrepresentation**

To prevail on a negligent misrepresentation claim, WBL must establish (1) a duty of care owed by Defendants to WBL; (2) that Defendants supplied false information to WBL; (3) WBL justifiably relied on the information; and (4) Defendants failed to

13

exercise reasonable care in communicating the information. See Williams v. Smith, 820 N.W.2d 807, 815 (Minn. 2012).

For the same reasons that they are not entitled to summary judgment on WBL's fraudulent misrepresentation and omission claims, and in addition to the fact that Palen and Carlson do not dispute that they hastily signed and provided WBL with the Acknowledgment, Palen and Carlson are not entitled to summary judgment on WBL's negligent misrepresentation claim.

**D.     Conversion**

Conversion is "an act of willful interference with the personal property of another, done, without lawful justification, by which any person entitled thereto is deprived of use and possession." Christensen v. Milbank Ins. Co., 658 N.W.2d 580, 585 (Minn. 2003) (citation and quotation marks omitted). Recently, the Minnesota Court of Appeals provided a thorough analysis about whether money, in its intangible form, constitutes property for conversion purposes. TCI Bus. Capital, Inc. v. Five Star Am. Die Casting, LLC, 890 N.W.2d 423, 428-30 (Minn. Ct. App. 2017). The court of appeals reasoned that "the premise that money in an intangible form is property . . . is without precedent in Minnesota law." Id. at 428. A conversion claim "is viable with respect to money only if the money is in a tangible form (such as a particular roll of coins or a particular stack of bills) and is kept separate from other money." Id. at 429. Because this case only involves money in an intangible form, WBL's conversion claim fails as a matter of law.

WBL makes two counterarguments that, although correct, are unpersuasive. First, WBL is correct that TCI's money-in-an-intangible-form analysis was dicta. The court of

14

appeals eventually held that the plaintiff failed to prove intent and therefore it "need not resolve" the money-in-an-intangible-form issue. Id. Second, WBL correctly cites to three cases from this District that hold that money in an intangible form can be the basis of a conversion claim under Minnesota law. Tommey v. Dahl, 63 F. Supp. 3d 982, 1000 (D. Minn 2014) (Erickson, J.); Damon v. Groteboer, 937 F. Supp. 2d 1048, 1077 (D. Minn. 2013) (Tunheim, J.); Cummins Law Office P.A. v. Norman Graphic Printing Co., 826 F. Supp. 2d 1127, 1133 (D. Minn. 2011) (Kyle, J.). All of these cases, however, predate TCI, and TCI even cites to Groteboer, albeit regarding a different claim. TCI, 890 N.W.2d at 431. Moreover, the court of appeals went to great lengths to discuss this issue, researching all of the Minnesota Supreme Court cases on conversion and analyzing the two cases concerning a conversion claim based on a transfer of money in an intangible form. Id. at 429. The Court will therefore defer to this more recent and thorough analysis of Minnesota conversion law by the Minnesota Court of Appeals and grant summary judgment in Defendants' favor on WBL's conversion claim.

**E.  Civil Theft**

"A person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater." Minn. Stat. § 604.14, subd. 1. The word "steals" in the statute means "that a person wrongfully and surreptitiously takes another person's property for the purpose of keeping it or using it." TCI, 890 N.W.2d at 431. "This definition makes clear that for a person to steal something, there must be some initial wrongful act in taking possession of the property." Staffing Specifix, Inc. v.

TempWorks Mgmt. Servs., Inc., 2017 WL 1316142, at *6 (Minn. Ct. App. Apr. 10, 2017).

It is undisputed that Palen and Carlson did not keep the money. The issue here is whether Palen and Carlson wrongfully took possession of WBL's money for the purpose of using it when Palen received the loan proceeds and gave the two checks to Carlson, and then Carlson gave the two checks to Hines. But that issue is for a jury to determine after making credibility assessments of all the parties, not for the Court to decide on a motion for summary judgment.

### F. Tortious Interference with a Contract

To establish a claim of tortious interference with a contract, WBL must prove (1) the existence of a contract; (2) Defendants' knowledge of the contract; (3) the intentional procurement of its breach; (4) without justification; and (5) damages. See Sysdyne Corp. v. Rousslang, 860 N.W.2d 347, 351 (Minn. 2015).

WBL cannot prove that Defendants intentionally procured the breach of WBL's loan agreement with Hines as a matter of law. Hines breached the contract when he stopped making payments on the loan and WBL provides no evidence that Palen or Carlson had anything to do with Hines's default. Summary judgment is therefore appropriate on this claim.

### G. Civil Conspiracy

To establish a civil conspiracy WBL must meet five elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and

(5) damages as the proximate result of the conspiracy." Gates v. Minnesota, No. 06cv1402, 2006 WL 2439002, at *2 (D. Minn. Aug. 22, 2006) (Magnuson, J.) (citations and quotations marks omitted).

Like the fraud claims, when the facts are viewed in the light most favorable to WBL, a reasonable jury could infer, from creating the fake invoices and signing the Acknowledgment, that there was a meeting of the minds between Palen and Carlson to misrepresent that Palen had sold Hines the kitchen equipment. Summary judgment is therefore inappropriate on this claim.

**H. Damages**

In the alternative to granting summary judgment on WBL's fraud claims, Palen requests that the Court order that WBL is not entitled to damages because Minnesota uses the "out-of-pocket rule" to determine the amount of damages sustained as a result of reliance on a misrepresentation. Under the out-of-pocket rule, "it is not a question of what the plaintiff might have gained through the transaction but what was lost by reason of defendant's deception. The loss is usually measured as the difference between what plaintiff parted with and what he received." Thomas & Wong Gen. Contractor v. Lake Bank, N.A., No. 06cv515, 2009 WL 4577722, at *12 (D. Minn. Dec. 1, 2009) (Montgomery, J.) (citations omitted). Palen contends that WBL is not entitled to damages because, although WBL parted with $250,000 when it disbursed the loan proceeds, Hines has already paid back over $250,000.

But Minnesota does not follow such a strict version of the out-of-pocket rule. Instead, Minnesota courts have "taken a broad view of what constitutes out-of-pocket

losses, holding that the rule permits the recovery of consequential damages proximately caused by the misrepresentation." Commercial Prop. Investments, Inc. v. Quality Inns Int'l, Inc., 61 F.3d 639, 647 (8th Cir. 1995). "The rule crafted by the Minnesota courts thus lies somewhere between a strict application of the out-of-pocket rule and the more liberal benefit-of-the-bargain rule." Id. at 648. WBL may therefore recover damages, including the loan's interest and WBL's attorney's fees related to the litigation against Hines, if it can prove that Defendants' allegedly fraudulent misrepresentations or omissions proximately caused those damages.

**CONCLUSION**

WBL's claims of conversion and tortious interference with a contract fail as a matter of law, but summary judgment is inappropriate on the rest of WBL's claims. Accordingly, **IT IS HEREBY ORDERED that**:

1. Palen's Motion for Summary Judgment (Docket No. 48) is **GRANTED in part** and **DENIED in part**; and

2. Carlson's Motion for Summary Judgment (Docket No. 50) is **GRANTED in part** and **DENIED in part.**

Dated: June 13, 2017

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge